IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| EUGENE SCOTT HAMPTON,<br>     Petitioner, | )<br>) | Civil Action No. 7:21cv00398 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| HAROLD W. CLARKE,<br>     Respondent. | )<br>) | By:  Michael F. Urbanski<br>Chief United States District Judge |

Eugene Scott Hampton, a Virginia inmate proceeding pro se, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2018 Grayson County Circuit Court convictions.  The respondent has filed a motion to dismiss, to which Hampton has replied, and the matter is now ripe for decision.  After considering the pleadings, the entire trial court record, and the law, the court will grant the respondent's motion to dismiss for the reasons stated below.

## I.

On September 20, 2017, Detective Greer of the Galax Police Department arrested Hampton on warrants charging statutory burglary of Gardner's Pawn Shop in Galax on September 18, 2017, and several related charges.  Hampton waived his preliminary hearing on October 23, 2017, and the grand jury for Grayson County issued five indictments on October 27, 2017:  Statutory burglary (Va. Code § 18.2-91), felony destruction of property (Va. Code § 18.2-137), possession of a firearm after being convicted of a violent felony (Va. Code § 18.2-308.2(A)), grand larceny of a firearm (Va. Code § 18.2-95(iii)), and larceny with intent to sell stolen property (Va. Code § 18.2-108.01).  To protect Hampton from unfair prejudice and in conformity with local rules of court, the trial on the charge of being a felon in possession of a

firearm was held separately from the trial on the remaining charges.  Mult. Hr'gs Tr. vol. 1 of 4 at 7, 43–44.  The first trial took place before a jury on March 7 and 8, 2018, on the charge of being a felon in possession of a firearm.

Seven witnesses testified for the Commonwealth.  Norman Baker, manager of the pawn shop, had worked there for ten years.  He worked on Saturday, September 16, 2017, while the store was open from 10:00 a.m. to 2:00 p.m.  When he left for the day, he set the alarm system, turned out the lights, and locked the door.  The store was closed on Sunday, September 17.  Around 1:20 a.m. on September 18, he received a call from the alarm company about a break-in.  He immediately went to the store, finding the front door open and a large hole in the plate glass window in front of the store.  The police had already arrived.  He noted that twenty-two handguns had been taken from the display case; from the office logbook, he was able to provide the federal Alcohol, Tobacco, and Firearms (ATF) agency with the model, caliber, and serial number of each missing handgun, as required by law. He described several of the guns to the jury, including a Derringer, a 1911 Colt 45 with nickel plating, and a purple 9-mm handgun with silver metallic glitter.  The missing guns included revolvers and semi-automatic handguns.  Each gun in the case had a white identification tag tied to it with a piece of string.  Trial Tr. vol. 1 at 148–159, March 7, 2018.

Baker testified that the alarm system had magnetic contacts on each door and interior motion detectors.  The plate glass window was not wired to the alarm.  The store also had four video cameras that ran 24 hours per day, 7 days per week, with nighttime recording capabilities, but all film is in black and white.  He and the police looked at the footage from the video cameras, and the police copied the footage onto a flash drive.  Baker testified that

the time-stamp on the video was an hour ahead of correct time because no one reset the clock for daylight savings time.  Viewing the video, Baker first thought the person's facial features resembled Ellis Hampton, petitioner's brother, a frequent customer of the shop, but the person was a larger build than Ellis and had a different hair style, and then he remembered petitioner, who came to the store on occasion, and he identified petitioner as the person on the video.  Based on the intruder's height in relation to the store's signage, Baker said the person on the video appeared to be 6'3", medium build, with dreadlocks.  Id. at 160–182. Joshua Adam Gardner, store owner, also testified, corroborating the break-in and missing firearms reported to the ATF.  Gardner did not know Hampton and could not identify him from the video.  Id. at 195–198.

Detective Greer from the Galax Police Department was on call the night of September 17/early morning of September 18, and he received a call between 1:30 and 2:00 a.m. to respond to the Gardner Pawn Shop.  Captain Cox was making a copy of the video when Greer arrived.  In addition to the broken glass, he saw a decorative landscaping brick in the floor, which he assumed to be how the intruder broke the glass. Officers processed the scene, but no readable fingerprints were found.  Greer could not identify the intruder from the video. He and other officers canvassed the surrounding neighborhood the next morning.  Captain Cox made some still photos from the video, and the images were posted on the police department's FaceBook page, asking for information.  Based on some of the tips received, he developed Hampton as a suspect.  He had known Hampton for the entire 22 years he worked for the Galax police department.  He looked at the still photos from the video again, and this time, felt that Hampton was the person on the video.

Greer went to speak with Hampton on September 18, and Hampton denied any involvement with the burglary.  He said he had spent the day with Mike Edwards, director of the Sober House, until around 10:30 in the evening.  Edwards then dropped him off at his brother's home, where Hampton said he had something to drink and visited his brother before walking home, where he stayed the rest of the evening with his girlfriend Mary Jane.  After speaking with Edwards and Mary Jane, Greer returned to question Hampton further. Hampton then admitted that he left home again that night and went to a football party at a friend's house, Misty, on Painter Street.  While there, he got into an argument with another person, David Gearheart, so he left and went back home.  He offered no explanation for failing to tell Greer about the party earlier.  When advised that the police had video footage, Hampton said he had received phone calls from a few friends and family members who told him they'd seen a picture that looked like him and advised Hampton to cut his hair.  Trial Tr. vol. 2 at 6–25, March 7, 2018.

Hampton and Mary Jane both consented to a search of their home.  No guns were found, and none of the clothes worn by the suspect on the video were found.  Greer admitted that Hampton was cooperative throughout the investigation.  He also reiterated on cross-examination that he did not recognize the person on the video or in the still shots the first times he looked at them.  He also admitted that the information posted by officer Jefferson on FaceBook with the pictures stated that the "suspect seems to be a white male with black or brown hair, wearing a hat, long sleeved shirt, and blue jeans." Id. at 30.  Hampton is African American, not white.  Greer acknowledged that he did not get any sleep from September 17

through September 20, when he arrested Hampton.  He also admitted that the guns from the pawn shop had never been found.  Id. at 24–34.

Misty Sanders testified that she held a get-together at her home on that Sunday, where people came to watch football and have something to drink.  Hampton was there, talking to David Gearheart, one of the people renting a room in her house, and Hampton said something that got David and his wife upset.  She asked Hampton to leave, and he left between 7 and 7:30 p.m.  Around 4:40 in the morning, Hampton woke her up, knocking on her bedroom window.  He was crying and visibly distraught.  He said he'd had a fight with his girlfriend, and she had put him out.  He asked Misty to drive him to his sister's house in Mt. Airy, North Carolina because he didn't have anywhere else to stay.  She agreed and drove him in her mother's Honda CRV to Mt. Airy.  While she drove, he was on the phone, calling his sister and some other people.  He was acting strange and talked like he was hiding something.  As soon as they arrived, Hampton jumped out of the car and went to the back to open the hatchback, which surprised her.  He lifted the carpet over the wheel compartment and pulled out a long black case.  She did not know that he had brought anything and had not seen him put anything in the car, so she was surprised.  When they went inside the sister's house, Hampton's sister and her husband took Misty to a room in the back and put her inside.  Misty came out a few minutes later because she had to use the bathroom.  When she came out, the black case was open, and she saw about thirty handguns with white tags (she thought were price tags) still on them.  She said she saw .22 caliber handguns, .45 calibers, and 9-mm guns.  One that caught her attention was purple with what looked like glitter on it.  She was upset because she was not supposed to be around guns.  Hampton kept her cell phone and purse,

but they let her keep her cigarettes and put her back in the back room and locked her in. Between an hour and an hour, 45 minutes later, Hampton's sister brought Misty her keys and told her she could go home.  Hampton was nowhere to be seen, and neither was the black case.  She drove home alone.  Id. at 36–49.

On cross-examination, Misty admitted that she did not have a valid driver's license and that she had a prior felony conviction.  She acknowledged that she was in a methadone treatment program because of her heroin addiction.  She also stated that she never saw the guns in Virginia and never saw Hampton put the black case in her car.  Id. at 50–62.

Wendy Gearheart, wife of David Gearheart, testified that she and her husband David rented a room from Misty.  On the night of September 17, petitioner (known to her as "Big Bird") came over while everyone was watching football.  Big Bird asked her husband David to "do a job for him."  He did not say what the job was, other than that it involved heavy lifting.  She thought it sounded fishy and told David he could not do it, that she would slap him and Big Bird upside the head if they went out of that house together.  She and David went to their room, and when she came back, Hampton was gone.  She does not know what time any of this occurred.  Trial Tr. vol. 1 at 140–145.

Angela (Angie) Daniels, Hampton's sister, testified that she lived in Mt. Airy, North Carolina.  On September 18, 2017, Hampton showed up unexpectedly at 7:00 in the morning. Her boyfriend Mike woke Angie up to tell her that her brother was there.  When Angie came into the living room, Hampton had Misty with him, whom she had never met before.  Misty said she had been up seven days straight using meth.  Angie also saw a black case and guns sitting on her kitchen counter in a black case.  She did not know who brought the case inside.

6

She was not sure what was going on and was concerned because she is not supposed to be around guns, because she was a convicted felon.  She remembered a lot of guns, and they each had a little white tag.  The only one that stood out in her mind was a Derringer, which she thought was cute, like in the westerns.  She asked Hampton where he got them, and he told her it was none of her business.  While she, Mike, and Hampton looked at the guns, Misty drove to the store to get cigarettes.  She got back 45 minutes later, saying she had gotten lost.  Then, Misty went out to get some beer.  This time, she was gone for a little over an hour, and when she came back, said she had gotten lost again.  Then Angie went to the store.  When she got back, Hampton was already gone, and Misty was getting in her car to leave.

The next day, Hampton came back to see her and wish her a happy birthday.  He was with Kim and another girl whose name she could not remember, and he had a burgundy duffel bag.  Johnny Jessup, known as "Claim," arrived at the house at the same time as Hampton. Claim was driving a rental car, but she could not remember what color it was.  Claim and Hampton went into another room together for a few minutes.  When they came out, Claim had the duffel bag and left.  Hampton stayed for about thirty minutes, and then he left.  Trial Tr. vol. 2 at 65–77.

Angie denied that anyone put Misty in a room and locked her in and denied that anyone took her purse and phone away from her.  Angie admitted that she had a long-standing drug problem.  Id. at 89–91.

Ronnie Michelle Criner testified that she met Jonathan Jessup, known to her as Claim, at a motel in Elkin North Carolina on September 20, 2017.  He was checking out of the motel and loading luggage into the trunk of a gray Charger, a rental car.  She noticed that he had a

burgundy bag in the trunk, partially open, with guns in it.  A purple gun with metallic glitter caught her attention.  She did not ask him anything about it, because she did not think she was supposed to see it.  Trial Tr. vol. 1 at 201–204.

The Commonwealth introduced a certified copy of Hampton's March 1995 conviction for being a felon in possession of a firearm and rested its case.  Hampton moved to strike the evidence as insufficient to establish jurisdiction, because no one saw Hampton with any guns except in North Carolina, and the person on the video in the pawn shop, although having a build like Hampton's, appeared to be white, and there were no clear shots of his face.  The trial court denied the motion to strike.

Mary Jane Nelson testified that she had been seeing Hampton for two and a half years, and they had lived together for two years before September 2017.  On September 17, 2017, she fell asleep watching television around 10:30 p.m.  Later, Hampton came home and woke her up.  Later they went to bed, but then moved back out to the couch to sleep.  He woke her in the morning, after the sun had come up, and said he was going to try to get a job at Turman's.  She did not see him again until she got home from work herself.  She worked from 3:00 p.m. to 2:00 a.m.  While she was walking home from work, police stopped her and said they needed to talk to Hampton.  She went home, where Hampton was watching television from the couch.  She said the police were looking for him, and he borrowed her phone to call the police, who said they would come to the house to talk to him in the morning.  He was cooperative with the police, and they both consented to a search of the house.  She remembers that police were looking at the bottoms of his shoes, but they did not take anything from the house except a hat.  They asked Hampton to go to the police station in Wytheville to answer

8

some more questions, and he agreed to go.  She left for work at 3:00 p.m., and when she came home at 2:00 a.m., she learned he had been arrested in Wytheville.  Trial Tr. vol. 2 at 105–118.

Michael Edwards, founder and director of the Sober Christian Fellowship House, testified that he had been operating the Sober House for fifteen years.  He had met Hampton a few years earlier, when Hampton came to the program seeking help with a long term drug addiction.  Hampton lived at the Sober House for nearly a year and successfully completed the program.  He and Hampton had stayed in touch since then, and Hampton had remained drug-free for over two and a half years.  On Sunday, September 17, 2017, Hampton came by with a woman in a jeep-like vehicle (as many described Misty's Honda).  No sooner than they got there, she got a call on her cell phone and said that she had to leave because something had happened to her dog.  Hampton stayed at Mike's for several hours because he liked to help Mike out in the garage, where Mike taught residents of the Sober House about car mechanics, to give them usable job skills, and he repaired cars for people in the community that could not afford to take their cars to a shop.  Mike drove Hampton to his brother's home and dropped him off around 11:00 p.m.  He saw Hampton again around 4:00 or 4:30 the next afternoon, September 18, when Hampton came by to share that he had gotten a job at Hardee's, and he was excited about it.  Id. at 121–130.

Finally, Hampton testified. Hampton testified that Misty came over to talk to him on Sunday, September 17.  She was upset because her tenants were not paying their rent. She was also worried about her son, who was hooked on meth.  Hampton said he suggested that they go talk to Mike Edwards to see if her son could get into Sober House and get treatment.  He rode in Misty's car to Mike's place.  Just after they arrived, Misty got a phone call that her dog

had been run over, and she rushed off without ever talking to Mike about her son's problem. Hampton remained at Mike's for four or five hours, and then Mike dropped him off at his brother Marvin's house, where he stayed another two or three hours. Id. at 132–137.

Misty, Chicago, and Brooke stopped by Marvin's house. Brooke and Marvin's girlfriend had a running feud, and they started arguing. Hampton left with Misty and went to her place, where they watched sports on television. Hampton said he told David Gearheart that he might be able to get him a job working for Mike. David was more interested in trying to rob a drug dealer who lived near the police station, and Hampton said he called David a stupid M-F'er. Hampton then left Misty's house and walked home, where he found Mary Jane sleeping on the couch. He woke her up to go to bed, and they talked for a little while. He told her about the commotion at Marvin's house before they went to sleep. Id. at 137–138.

The next morning, he got up early to look for work. He told Mary Jane he was going to follow-up his prior application at Turman's with a personal inquiry at the facility. While walking between prospective jobs, he ran into Misty, who offered to buy him a beer if he would ride with her to North Carolina, where she was going to buy some weed. While driving, she asked Hampton if he knew where she could score some dope. Hampton said his sister might be able to help her out, since they were going to North Carolina any way. Id. at 139, 143.

When they got to his sister's house, Misty stayed for 30 minutes and then drove somewhere to meet her contact and to pick up a 12-pack of beer. When she returned to Angie's house, Misty and Angie went into another room; he thought they were smoking crack. When Misty came back out, she said she had been ripped off for $160 and she left. Angie had

to drive Hampton back to Virginia, and she dropped him off at Mike Edwards' place around 4:00 or 4:30 in the afternoon.  Id. at 140–143.

Hampton denied burglarizing the pawn shop, denied stealing the guns, and denied taking any guns to North Carolina.  Id. at 146–147.

The defense offered the testimony of Daniel Bise, who was going to testify that Misty had previously sworn criminal charges against him and then recanted, but the court did not allow the testimony, ruling that specific prior bad acts are not admissible for impeachment. Trial Tr. vol. 3 at 5–25.

The defense renewed the previous motion to strike, which the court denied. After closing arguments, the jury deliberated and found Hampton guilty of being a violent felon in possession of a firearm.  No additional evidence or argument was presented at the sentencing phase, and the jury sentenced Hampton to the mandatory five year sentence.  Hampton waived a presentence report, and the court entered final judgment on the verdict on March 8, 2018.

Two weeks later, March 22 and 23, 2018, the second trial was held on the remaining charges.  The destruction of property charge was reduced from a felony to a misdemeanor prior to the trial.  The same witnesses testified for the prosecution, for the most part. Additional evidence included the cost of repairing the sheet glass window at the pawn shop, $700.00.  Trial Tr. vol. 2 at 140–141, March 22, 2018.  Joshua Adam Gardner, pawn shop owner, estimated the value of the guns never recovered at $10,000 to $11,000, based upon his twenty years of experience in gun sales.  Trial Tr. vol. 3 at 8–9.  An additional witness, Amy Lamm, with state probation and parole, testified that she first saw the still photo of a then

unknown suspect (from the video of the burglary) in a newspaper article about the robbery. She recognized the photo as being Hampton.  Trial Tr. vol. 2 at 187–188.

On cross-examination, the defense asked witnesses about other people they might know, Big Poo, Joe Gamble, D. L. Campbell, and Wilbur Campbell.  Detective Greer described Joe Gamble as "a tad smaller" than Hampton; he did not directly answer whether Wilbur Campbell had the same build as Hampton, saying only he had not seen Wilbur in years. Id. at 140–141.  Hampton's sister, Angie, identified Big Poo as a drug dealer in the Galax area and D. L. Campbell as her cousin.  She acknowledged that all four of them were the same size and had the same stomach that was prominent on the video camera, and said they all resembled Hampton, except for Gamble, because Gamble did not have any hair.  Id. at 172–173.

Mike Edwards of Sober House and Mary Jane Nelson testified for the defense.  This time, Hampton did not testify.  A new witness, Kaminski Gatling, another person who roomed at Misty Sanders' home, testified that Misty used meth daily in September 2017.  Trial Tr. vol. 3 at 72–74.  He also remembered that Hampton and Gearheart had gotten into an argument on September 17.  Gatling testified that he had to get up early to go to work on September 18, leaving the house between 6:00 and 6:15 a.m.  When he left, Misty was not up, and her mother's car was still in the driveway.  Id. at 82–83.

Counsel made no motions to strike.  Following closing arguments and deliberations, the jury was unable to reach a verdict on the statutory burglary charge and the destruction of property charge, but the jury convicted Hampton of larceny of firearms and possession of stolen property with intent to sell.  Trial Tr. vol. 4 at 13–15.  The trial court granted a mistrial

on the burglary and destruction of property charges.  During the sentencing phase, the Commonwealth introduced certified copies of Hampton's prior convictions: possession of a firearm by a convicted felon in 1995; two convictions for simple possession of schedule II drugs, one possession with intent to distribute, two distributions, and three distributions of imitation schedule II drugs, between 1999 and 2011; driving after being a habitual offender in 2012; and probation violations in 2004 and 2012. Id. at 18–20.  Hampton testified to tell the jury that he had always pled guilty when he was guilty.  He explained that he had a very bad drug problem, for which he got treatment at the Sober House.  He had been clean, without using drugs, for three years.  Finally, he explained that he was on probation, with up to 6 years, 11 months of time coming his way for being convicted of new charges. Id. at 25–32.  The jury returned a sentence of five years on each charge.  Id. at 48–49.  After the jury was discharged, the defense moved to strike the sentence because the jury had been told about Hampton's probation violations, although the judge had given a curative instruction to disregard that evidence.  The trial court denied the motion as untimely. Id. at 52–53.

Following consideration of a presentence report, sentencing guidelines, and argument of counsel on July 5, 2018, the court imposed its sentence.  Although the sentencing guidelines recommended a range of two years, two months to five years, six months, with a midpoint of four years, five months (Id. at 77), the court imposed a sentence of five years for larceny of a firearm, in accord with the jury's verdict.  On the possession of stolen property with intent to sell, he imposed a sentence of ten years, with five suspended for ten years, conditioned on three years of supervised probation.  The sentences were to run consecutively with each other and with the prior judgment order for possession of a firearm by a convicted felon.  The court

also imposed restitution of $10,000 to Gardner Pawn Shop.  Id. at 84.  The final order was entered the same day, July 5, 2018, and the Commonwealth ultimately nolle prossed[1] the counts on which the court had previously granted a mistrial.

Hampton appealed the final judgments from each trial. His appeal from the second jury trial was procedurally dismissed by the Court of Appeals.  Hampton v. Commonwealth, No. 123318 (Va. Ct. App. Jan. 31, 2020).  The Court of Appeals denied his appeal from the first trial.  Hampton v. Commonwealth, No. 056418 (Va. Ct. App. July 19, 2019), reh'g denied (Sept. 4, 2019).  The only ground raised in the appeal was that the evidence was incredible as a matter of law and insufficient to support the conviction.  The Supreme Court of Virginia refused further appeal.  Hampton v. Commonwealth, No. 191222 (Va. Sept. 9, 2020), reh'g denied (Nov. 25, 2020).

Hampton filed a state petition for habeas corpus in the Grayson County Circuit Court on February 10, 2020, which the court dismissed on June 11, 2020.  His appeal to the Supreme Court of Virginia was procedurally dismissed.  Hampton v. Clarke, No. 210494 (June 21, 2021).  On July 9, 2021, the current timely federal petition was filed, raising the following issues:

1. Ineffective assistance of trial counsel for keeping Hampton from getting his discovery and for failing to preserve issues for appeal.

2. Insufficient evidence to support his conviction.

3. Insufficient testimonies to support his conviction.

---

[1] "Nolle pros," a shortened form of the Latin phrase "nolle prosequi," refers to the Commonwealth's decision to drop charges.

4. No jurisdiction over the felon in possession of a firearm charge.

5. Another person has subsequently been convicted of having one of the stolen guns in his possession, whereas law enforcement never found any of the stolen guns in Hampton's possession.

6. The two larceny convictions should be dismissed because they are inconsistent with the outcome of the burglary and destruction of property charges.

7. Hampton could not have burglarized the pawn shop because the intruder on the video was a white man, and Hampton is Black.

8. Hampton was never given his discovery.

## II.

### A. Limitations on Habeas Review

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, a federal district court reviewing a § 2254 petition is limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state grounds. The procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights. Coleman v. Thompson, 501 U.S. 722, 730–31 (1991).

A habeas petitioner is required to exhaust his claims in state court before his claims can be considered in federal court. 28 U.S.C. § 2254(b)(1)(A). To exhaust his claims, a petitioner

must present his federal constitutional claims to the highest state court, on the merits, before he is entitled to seek habeas relief. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court. Duncan v. Henry, 513 U.S. 364, 365–66 (1995); Kasi v. Angelone, 300 F.3d 487, 501–02 (4th Cir. 2002). Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance." Coleman, 501 U.S. at 732.

A separate but closely related issue is the doctrine of procedural default. If a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that provides an independent and adequate ground for the state court's decision, that claim is also procedurally defaulted for purposes of federal habeas review. Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). A state procedural rule is independent if it does not depend on a federal constitutional ruling, and it is adequate if it is firmly established and regularly applied by the state court. Yeatts v. Angelone, 166 F.3d 255, 263–64 (4th Cir. 1998). A claim that has not been presented to the highest state court on the merits and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now is considered simultaneously exhausted and defaulted. Bassette v. Thompson, 915 F.2d 932, 936–37 (4th Cir. 1990).

All of Hampton's claims have been procedurally defaulted. Although the appellate courts were ostensibly presented with Hampton's sufficiency of the evidence claim, based on the inherent incredibility of the witnesses, the Court of Appeals declined to consider the argument because it had not been preserved in the trial court, as required by Rule 5A:18.

Hampton, No. 156418, slip op. at *3. Rule 5A:18 is an independent and adequate state law ground for refusing to consider the merits of Hampton's appellate issue. King v. Dean, 955 F.2d 41, 1992 WL 29295 (4th Cir. 1992) (unpublished). Because the Supreme Court of Virginia refused his appeal without further opinion, this court looks through to the last reasoned opinion, the one from the court of appeals. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (holding that a federal habeas court must presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). Because the issue was not preserved in the trial court, it was procedurally defaulted on appeal and is also procedurally defaulted in federal habeas.

No other issues ever made it to the Supreme Court of Virginia. The appeal from the second jury trial was dismissed by the Court of Appeals of Virginia and not appealed further. The habeas appeal was procedurally dismissed by the Supreme Court of Virginia. Accordingly, any issues raised in the second appeal or in the habeas petition have been procedurally defaulted.

If a petitioner shows both cause for the default and actual prejudice from the claimed federal violation, only then may a federal habeas court consider the merits of a procedurally defaulted claim. Coleman, 501 U.S. at 750. Cause for procedural default requires the existence of some objective factor not attributable to the prisoner. Id. at 756–57. To show prejudice, a petitioner must show that the claimed violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982).

17

B. <u>Analysis of Defaulted Claims</u>

At the outset, Hampton has indicated that the COVID emergency extended his time for appeal and that access to prison law libraries was cut off. Pet.'s Resp. Opp. Mot. to Dismiss, ECF No. 21. The Fourth Circuit Court of Appeals has held that lack of library access is not good cause for equitable tolling of the statute of limitations. <u>United States v. Sosa</u>, 364 F.3d 507, 512 (4th Cir. 2004). However, the court need not decide whether restricted access to the law library constitutes good cause for procedural default in this case. Hampton's trial was held in early 2018, two years before the COVID pandemic. Any failure to preserve issues at trial to be raised on appeal was not due to lack of access to the prison library. Likewise, Hampton's direct appeal of the first trial had already been filed with the Supreme Court of Virginia before the pandemic. When the court refused the appeal in September 2020, Hampton successfully filed a petition for rehearing, notwithstanding lack of access to the law library. The appeal from his second jury trial was procedurally dismissed January 31, 2020, before the national pandemic emergency had been declared. Finally, Hampton filed his habeas petition in Grayson County Circuit Court in February 2020; when the petition was dismissed June 11, 2020, further research was not necessary to file an appeal saying that the circuit court decided the issues incorrectly; the issues had already been raised in the petition. Although the Supreme Court of Virginia temporarily tolled deadlines for appeals, all tolling of appellate deadlines ended July 19, 2020. <u>In re: Seventh Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency</u> (Va. July 8, 2020). The extension did not justify a delay of eleven months; the Supreme Court of Virginia did not receive Hampton's habeas appeal until May 21, 2021.

Because Hampton has failed to show good cause, the court could end the analysis here. To be thorough, however, the court will explain why Hampton's claims do not satisfy the prejudice test either.

### 1.  Ineffective Assistance of Trial Counsel

A special test applies to defaulted claims of ineffective assistance of trial counsel. Martinez v. Ryan, 566 U.S. 1, 13–15 (2012).  In such cases, procedural default is overlooked if the following requirements are met: (1) The claim of ineffective assistance of trial counsel is a substantial claim; (2) the cause for default is the lack of counsel or ineffective assistance of counsel under the standards of Strickland v. Washington, 466 U.S. 668 (1984); (3) the state post-conviction proceeding was the first time ineffective assistance of counsel was raised; and (4) the state post-conviction proceeding was the first one in which petitioner was allowed by law to raise the claim.  Trevino v. Thaler, 569 U.S. 413, 423 (2013); Martinez, 566 U.S. at 13–15.  Virginia is a state in which ineffective assistance of counsel must be raised in post-conviction pleadings, not on direct appeal.  Lenz v. Commonwealth, 261 Va. 451, 460, 544 S.E.2d 299, 304 (2001).  Hampton had no counsel for his state habeas petition.  The issue that remains is whether his claim is substantial, that is, whether it has some merit.

Hampton alleges two ways in which counsel was ineffective: Keeping Hampton from getting discovery (also raised in claim 8) and failing to preserve issues for appeal.  When reviewing counsel's performance, courts apply a highly deferential standard.  A petitioner must show that counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. at 687.  Deficient performance requires a showing

that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." Id. at 688.  A reviewing court must presume that counsel's decisions were reasonably made and that counsel rendered adequate assistance. Id. at 689–90. The prejudice prong requires a petitioner to show "a reasonable probability that the outcome of the proceedings would have been different." Id. at 694.  Hampton cannot make these showings on either claim.

The discovery order entered included a protective order that certain materials provided to the defendant's attorney could not be copied and provided to any other person, including the defendant.  Pet. Ex. A, ECF No. 1-1.  Agreeing to the protective order was not ineffective assistance of counsel, because discovery requirements are satisfied when the Commonwealth provides the evidence to a defendant's attorney, when the defendant is represented by counsel. Pope v. Commonwealth, 234 Va. 114,120, 360 S.E.2d 352, 356 (1987); Bell v. Commonwealth, 24 Va. App. 208, 212, 481 S.E.2d 473, 475 (1997).

The items that Hampton indicates he wanted to get included "the owner of the house's statement to the police" and video from the bank near the pawnshop.  Pet. Resp. in Opp. Mot. to Dismiss at 4, ECF No. 21.  He further alleged that the owner of the house "was there, they didn't question him." Id.  At the time of Hampton's trial, the Commonwealth was not required to produce statements of witnesses or prospective witnesses in discovery, except for written scientific reports of experts within the control of the Commonwealth, or exculpatory statements.  Rule 3A:11, Sup. Ct. Rules; Brady v. Maryland, 373 U.S. 83, 87 (1963).  Hampton has not alleged that the homeowner's statement was exculpatory, nor that it was a scientific report, only that he wanted to know what the man said.  Thus, he has not established that he

was entitled to receive any statement by that witness.  Further, the Commonwealth would be required to allow counsel to inspect and copy a video if it was in the Commonwealth's possession.  If the Commonwealth did not have the bank's surveillance video, then Hampton could not require the Commonwealth to obtain it.  If the Commonwealth had a copy of the video, then allowing counsel to look at it would satisfy the government's obligation.  Either way, Hampton has not demonstrated that he has been denied access, through his trial attorney, to any discovery that he was entitled to.  Further, he has not shown that any such discovery would have made any difference in the outcome of his case.

Likewise, Hampton has not identified the issues trial counsel failed to preserve for appeal.  He cannot prevail on a claim for which he has not identified the specific factual basis supporting how his rights have been denied.  Bassette v. Thompson, 915 F.2d 932, 940–41 (4th Cir. 1990).  Presumably, Hampton is referring to the sufficiency of the evidence claim, based on the inherent incredibility of the witnesses.  Because the claim that the evidence was insufficient is without merit, as discussed in the next subsection, counsel was not deficient for failing to preserve the argument.  Further, because the argument was without merit, Hampton was not prejudiced by the failure to preserve the issue; the issue would likely have been dismissed on the merits by the court of appeals.  Counsel's failure to preserve that issue does not undermine confidence in the outcome of the case.

Because he has not established either deficient performance or prejudice, Hampton has failed to overcome procedural default on these claims.  Claim 1 for ineffective assistance of counsel and claim 8 for not receiving discovery will be dismissed.

21

2. **Insufficiency of the Evidence**

To prevail on a due process claim that the evidence is insufficient to support a conviction, a petitioner must show that the evidence at trial, in the light most favorable to the government, is such that no rational trier of fact could have found guilt beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 322 (1977).  The evidence was previously discussed in great detail.  In the light most favorable to the Commonwealth, the evidence supporting the convictions includes Misty Sanders' testimony that Hampton removed a black case from the spare tire place in her CRV and carried the case into his sister's home, where she saw firearms in the case when it was opened.  Hampton's sister, Angie Daniels, also testified that the black case, with guns, was open on her kitchen counter when she came to the living room after Hampton and Misty's arrival.  Their descriptions of the guns matched descriptions of some stolen from the pawn shop.  Angie testified that Hampton returned on her birthday with a burgundy duffel bag; after Hampton met briefly with Claim, Angie saw Claim leave with the burgundy duffel bag.  Criner later saw guns in the burgundy duffel bag in the back of Claim's car, including the unusual purple handgun with metallic glitter.  Baker, Greer, and in the second trial, Lamm, testified that they identified Hampton in the photos made from the video captured during the burglary.  The jurors saw the video and the still photos.  All this testimony and evidence, if believed by the jury, is more than sufficient to support the jury's verdict.

Hampton challenges the sufficiency of the evidence by noting that the police never found any weapons on his person or in his home, by challenging both the credibility and honesty of the Commonwealth's witnesses, and by arguing that the person on the black and white video is a white man, not a Black man. (His claims 2, 3, and 7 are considered together

in this subsection.)  If there is evidence to support the conviction, a reviewing court may not substitute its judgment for the jury's, even if its view of the evidence might differ from the conclusions reached by the jury.  Commonwealth v. McNeal, 282 Va. 16, 20, 710 S.E.2d 733, 735 (2011).  The factfinder, in this case the jury, has the sole responsibility to determine the credibility of the witnesses, how much weight to give their testimony, and what inferences to draw from facts established.  The factfinder is not limited to choosing between different accounts offered by different witnesses; rather, credibility determinations often include "resolving conflicts in a single witness' testimony, accepting that part of the testimony it deems credible and rejecting the portion it deems incredible."  Id. at 22, 710 S.E.2d at 736.

Angie Daniels' testimony conflicted in several respects from Misty Sanders' testimony. The jury may or may not have believed that Misty was held hostage in a back bedroom at Angie's house; they may or may not have believed that Misty went to the store and got lost. The jury could disregard that portion of the testimony they found unbelievable and still find that both women saw firearms in a black case.  The jury could believe that Misty's testimony was an effort to avoid any responsibility for her role in the events of the day, but still believe that Hampton brought the black case with guns in her car and then carried the case into Angie's house.  Both ladies described handguns matching the description of ones stolen from the pawn shop. Their testimony, if those critical facts were believed, is sufficient to support the conviction for felon in possession of a firearm, larceny of firearms, and possession of stolen property with intent to sell.

Hampton asserts that both Misty and Angie perjured themselves.  The jury at the first trial heard Hampton's testimony contradicting their testimony, but they believed Misty and

Angie.  At this stage of the proceedings, it will take a lot more than Hampton's continued assertions that they are liars to render the testimony insufficient.

Finally, Hampton's argument that the intruder was a white man, not him, does not help him.  First, Hampton was not convicted of the statutory burglary, the only charge for which doubts about the intruder's identity could make a crucial difference.  Even had he been convicted for the burglary, the jurors had a chance to view the video and take the still photos introduced into evidence into their deliberations.  None of the photos contained a full facial image of the intruder.  The video and still shots from it were black-and-white and grainy.  Although the jury did not convict on the burglary, the hung jury indicates that at least one of the jurors and probably more believed that Hampton was the man in the video, or believed the testimony of Baker, Greer, and Lamm.  Some could not resolve doubt about his role in the burglary, but they still determined from all the other evidence, including inferences to be drawn by the guns being in his possession the same morning after the store had been burglarized, that he had stolen them or participated in stealing them.

Hampton has not shown that he suffered prejudice from procedural default of these issues.  Claims 2, 3, and 7 will be dismissed.

### 3.  Challenge to Virginia Jurisdiction

Hampton claims that the evidence was insufficient to establish that he possessed a firearm in Virginia, because the testimony[2] of witnesses placed him and the guns in North Carolina.  The Commonwealth need not introduce direct evidence that Hampton possessed

---

[2] Contrary to Hampton's characterization, the testimony of Angie and Misty was not hearsay.  They both testified about what they saw and nothing more.  Likewise, Ronnie Criner testified that she saw guns in a burgundy duffel bag in Claim's trunk.  If Criner had testified that Claim told her where he got the guns, that would be hearsay.

the gun in Virginia; any fact that can be proved by direct evidence may also be proved by circumstantial or indirect evidence.  Etherton v. Doe, 268 Va. 209, 213, 597 S.E.2d 87, 89 (2004).  Sometimes, only indirect and circumstantial evidence is available.  Gray v. Commonwealth, 260 Va. 675, 680, 537 S.E.2d 862, 865 (2000).  Even without considering the evidence identifying Hampton as the intruder on the video in the Galax, Virginia pawnshop, evidence that Misty drove Hampton from Virginia to Mt. Airy, North Carolina, without making any stops along the way, and that Hampton removed the black case from the back of her car as soon as they arrived, is sufficient to infer that Hampton knew the case was there, knew what was inside the case, and exercised control over it.

A conviction for unlawful possession of firearms may be supported completely by evidence of constructive possession; to establish constructive possession, the Commonwealth need only present evidence of acts, statements, or conduct by the defendant, or other circumstances showing that the defendant was aware of the presence and character of the firearms and that the firearms were subject to his dominion and control.  Smallwood v. Commonwealth, 278 Va. 625, 630, 688 S.E.2d 154, 156 (2009).  Hampton's knowledge of and control over the black case filled with guns when they arrived in North Carolina creates a strong inference that he knew the guns were there in Virginia, subject to his control and dominion.  That the handguns described by Misty and Angie were consistent with the ones stolen in Virginia that same morning, by someone resembling Hampton, is another circumstance supporting the inference.

Hampton has not shown any prejudice from his procedural default of this issue, and claim 4 will be dismissed.

### 4. **Someone Else Convicted of Possessing One of the Guns**

Unexplained possession of recently stolen goods is sufficient to allow a factfinder to infer that the possessor was the thief.  Archer v. Commonwealth, 26 Va. App. 1, 13, 492 S.E.2d 826, 832 (1997).  At the time Misty and Angie saw Hampton with the firearms, they were very recently stolen, only six hours earlier.  Hampton was convicted of stealing the guns and of possessing them with intent to sell them after they had been stolen.  The guns had not been recovered at the time of Hampton's trial.

Subsequently, in July 2019, Leonard Brown was arrested on other charges.  At the time of his arrest, he was determined to be in possession of one of the guns that had been stolen from the pawn shop a year and a half earlier.  Brown was convicted of several offenses, including possession of a firearm by a convicted felon.  Hampton suggests that Brown's possession of the gun in 2019 somehow proves that Hampton did not steal or possess the gun in 2017.  His argument is not persuasive.  The Commonwealth's evidence established that the guns had been transferred from Hampton to Claim at some point, no later than September 20, 2017.  In the intervening year and a half, no one can say how many times possession of the weapon changed hands.  Hampton would have a different argument if Brown had been arrested, with the gun in his possession, before anyone saw Hampton with possession of the guns, but that is not the timeline we have.  Brown's possession of one of the guns nearly two years after the burglary does not raise any concerns about the validity of Hampton's conviction, and Hampton has not been prejudiced by defaulting this issue.  Claim 5 will be dismissed.

5.  **Inconsistent Verdicts**

Hampton argues that his conviction for larceny of the firearms is inconsistent with the outcomes on the burglary and destruction of property charges.  His argument is without merit for two reasons, first because a hung jury is not the same as an acquittal.  Had the Commonwealth been so inclined, Hampton could have been re-tried on the counts that were mistried because of the hung jury.  Second, inconsistent jury verdicts are not reviewable, so long as the evidence is sufficient to support conviction for the crime of which the defendant was convicted.  United States v. Powell, 469 U.S. 57, 66 (1984); McQuinn v. Commonwealth, 298 Va. 456, 459–61, 839 S.E.2d 907, 910–11 (2020).  Even if the jury acquitted Hampton of burglary and destruction of property, that alone would not be grounds for setting aside his other convictions.  Hampton has not been prejudiced by his procedural default of this claim; claim 6 will be dismissed.

### III.

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.  Fed. R. Gov. § 2254 Cases 11(a).  A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2553(c)(2).  The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).  In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right.

Gonzalez v. Thaler, 565 U.S. 134, 140–41 (2012).  Hampton has not made such showings in this case.

    For the foregoing reasons, the court will grant respondent's motion to dismiss, dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

    **ENTER:**  This 31st day of August, 2022.

Digitally signed by Michael F.
Urbanski      Chief U.S. District
Judge
Date: 2022.08.31 15:36:07
-04'00'

_____
Michael F. Urbanski
Chief United States District Judge